Argued and submitted October 31, 2006, affirmed April 11, 2007

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# ROBERT ALLEN FOREMAN,
*Defendant-Appellant.*

Linn County Circuit Court
01081917; A119825

157 P3d 228

Rebecca Duncan, Chief Deputy Public Defender, argued the cause for appellant. With her on the briefs were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Steven Powers, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.

ROSENBLUM, J.

**ROSENBLUM, J.**

Defendant appeals following his conviction and sentencing for one count each of first-degree sexual abuse, ORS 163.427, and first-degree sodomy, ORS 163.405. He assigns error to the trial court's admission into evidence of hearsay statements made by the three-year-old victim to her mother. He also asserts that the trial court committed plain error in admitting evidence of statements that the victim made to a doctor, in violation of defendant's rights under the Confrontation Clause. Finally, he argues that the trial court violated his right to a jury trial by sentencing him under Measure 11 rather than under the sentencing guidelines. We affirm.

The facts pertinent to this appeal are undisputed. The material facts pertain primarily to defendant's first assignment of error, in which he challenges the trial court's ruling on a motion *in limine* made by the state. The state correctly anticipated that the court would later rule that G, the victim of defendant's offenses, was not competent to testify at trial.[1] It therefore made a motion *in limine* to determine whether her mother could testify about statements that G had made to her concerning the abuse. Because the facts of the case are primarily relevant to that motion, except where noted, we draw the facts from the record of that hearing.

At the time of the offenses for which defendant was convicted, G and mother lived in a trailer park in Sweet Home. G was three years old. G's great-grandmother lived in a trailer a few spaces away. Defendant, who lived in Lafayette, is great-grandmother's son and G's great-uncle.

At the hearing on the state's motion *in limine*, mother testified to the facts that follow. Sometime in September, October, or November of 2000, G spent a night with great-grandmother in her home. When mother picked G up the next morning at about 8:30, defendant was there. Mother testified that, sometime between a week and a month later, G spent the night with mother's aunt. She complained to mother's aunt that urinating was painful, and mother's

---

[1] To protect the victim's privacy, we refer to her as "G" and to her mother as "mother."

aunt told mother about the complaint when she picked G up the next day. Mother, who had herself been sexually abused as a child, became concerned that G had been abused. Later that evening, mother took G to the grocery store. As they walked from the parking lot to the store, using a tone she described as "friendly" and "playful," she asked G, "[H]as anybody ever touched you in your private parts?" G said, "Yes." Mother asked her, "Well, now who would do a thing like that?" G responded, "My Uncle Bob," referring to defendant. Mother asked her where he had touched her, and G pointed to her genital area. Mother then asked her where the touching had happened, and G told her that it had happened at great-grandmother's home. Mother decided to make a doctor's appointment to have G examined, and she asked her no further questions.

According to mother's testimony, around the same time, some of G's behavior changed. Mother testified that, in addition to complaining that it hurt to go to the bathroom, "she didn't want anyone to wipe her, and she very seldom would wipe herself." According to mother, G had not previously had any trouble wiping herself and had been comfortable with allowing adults to do it for her. Mother testified that G also became uncomfortable with changing her clothes with anyone around, which had not previously been the case.

Mother also testified that G would no longer go to the bathroom by herself. A day or two after G told mother that defendant had abused her, mother and G were at great-grandmother's home when G had to use the bathroom. She would not go by herself, so mother accompanied her. As they walked down the hall toward the bathroom, they passed great-grandmother's guest bedroom. According to mother, G stopped and, without any prompting, said, "This is where Uncle Bob was touching me. He had me on the bed."

At the hearing on the state's motion *in limine*, the state also called Dr. Chervenak, a doctor at a child victim assessment center, as a witness. She testified that she examined G on November 22, 2000. Chervenak testified that, after giving G a physical examination, she excused mother and a nurse from the room and interviewed G privately:

"My routine at that point is to remind them that I'm a doctor. And so I say, 'I'm a doctor and I see lots and lots of kids that have been hurt or touched in ways they didn't like.' And I pause. And I say, 'Did that ever happen to you?' And then I write down what they answer.

"Q: You said those things to her?

"A: Yes, I did.

"Q: What happened next?

"A: She said, 'Yes.' And I said to her, 'Can you tell me more about that?' And when she's saying this part, she says yes, she's looking down at the floor. And I said, 'Can you tell me more about that?' And she said, 'Uncle Bob.' And then she looked up and she looked right at me and she said, 'He was naked. He did not have clothes on.' And she was very— she had kind of a serious expression on her face when she said that. And I asked her to tell me more about—I said, 'Can you tell me more about that?' And she said, 'His knot was moving around a lot.'

"And I happened to have a—I have a lot of stuffed animals in the room—and I had a stuffed bear sitting next to me, and I picked up the stuffed bear, it's about this big, and I said, 'Can you point to the bear, where is this knot? Where would the knot be on this bear?' And she pointed at the crotch of the bear, where the genital area would be located. And I asked [G], 'Where did Uncle Bob touch you?' And she said, 'In his house.' And then I asked her, 'Where on your body did Uncle Bob touch you?' And she looked at me and pointed to her genitalia and she said, 'He touched me right here.' And she said that with—it was sort of emphatic."

Chervenak testified that G indicated that defendant had touched her genitalia with his hands and with his penis. The doctor asked "if anything had touched her mouth * * *." She testified that G told her, "Yes. I was choking real bad." When Chervenak asked G what had touched her mouth, G replied, "His knot." According to Chervenak, G then spontaneously said, "I told him to stop." She next testified that she asked G whether defendant had said anything when that was happening and G "said he went, 'Okay, okay, okay,' and she put her two hands up like this." G also told her that she was crying.

The trial court ruled that G's hearsay statements to mother were admissible under OEC 803(18a)(b). At defendant's trial, as the state had anticipated, the court ruled that G was unavailable as a witness because she was not competent to testify. Thus, mother testified about the statements that G made at the grocery store and at great-grandmother's home. The state also called Chervenak to testify. Among other things, she testified about the statements that G made to her. Defendant did not object to that testimony.

At the close of trial, the jury found defendant guilty of both first-degree sodomy and first-degree sexual abuse. The trial court imposed mandatory minimum sentences pursuant to ORS 137.700. It sentenced defendant to 75 months in prison, with 10 years' post-prison supervision, on the sexual abuse conviction and 100 months in prison, with 20 years' post-prison supervision, on the sodomy conviction.

On appeal, defendant makes three assignments of error. In the first, he challenges the trial court's ruling on the state's motion *in limine.* He argues that the court erred in concluding that the state had satisfied the requirements of OEC 803(18a)(b). In particular, he contends (1) that the state did not establish that the time, content, and circumstances of G's statements provided adequate indicia of reliability, (2) that her statements did not bear sufficient indicia of reliability to satisfy constitutional concerns, and (3) that the state did not offer sufficient corroborative evidence that the abuse occurred or that defendant had an opportunity to engage in the abuse. We write only to address defendant's argument concerning corroborative evidence of his opportunity to engage in the abuse; we reject his other arguments without discussion.

■ OEC 803(18a)(b) provides, in part, that a statement made by a person concerning an act of abuse is not excluded as hearsay under certain circumstances. If the declarant was under 12 years of age when the statement was made and is unavailable to testify at trial,

"the statement may be admitted in evidence only if the proponent establishes that the time, content and circumstances of the statement provide indicia of reliability, and in a criminal trial that there is corroborative evidence of the

act of abuse and of the alleged perpetrator's opportunity to participate in the conduct and that the statement possesses indicia of reliability as is constitutionally required to be admitted."

*Id.* Defendant argues that there is no evidence to support the trial court's finding that defendant had the opportunity to commit the acts that G alleged. Specifically, he asserts that there was no evidence that he was ever alone with G, much less evidence that he was alone with her for such a time that he could commit the charged acts.

Defendant reads too much into the requirement for corroborative evidence of the opportunity to participate in the alleged conduct. OEC 803(18a)(b) does not require *dispositive proof* of such an opportunity; it requires only *evidence* of an opportunity. In *State v. Reed*, 173 Or App 185, 194, 21 P3d 137 (2001), we explained that corroborative evidence is independent evidence that tends to strengthen, confirm, or make more certain the matter in support of which it is offered. Mother's testimony that defendant was at great-grandmother's home when she picked G up supports and strengthens the conclusion that defendant had an opportunity to abuse G. Evidence that defendant was alone with G for a period of time would certainly constitute stronger corroboration, but it is not required in order to satisfy OEC 803(18a)(b).

Because there is evidence in the record that supports the trial court's finding that defendant had the opportunity to participate in the conduct for which he was convicted, we are bound by that finding. *See State v. Arellano*, 149 Or App 86, 90, 941 P2d 1089 (1997), *rev dismissed*, 327 Or 555 (1998) (if evidence in the record supports a trial court's findings on preliminary evidentiary matters, those findings are binding on appeal); *State v. Renly*, 111 Or App 453, 468 n 12, 827 P2d 1345 (1992) ("Whether evidence corroborates an act of sexual conduct and defendant's participation is a preliminary question of fact, because it concerns the admissibility of evidence."). We therefore reject defendant's first assignment of error.

In his second assignment of error, defendant argues that the trial court erred in admitting Chervenak's testimony

about G's statements. He does not challenge the testimony on hearsay grounds; rather, he asserts that its admission violated his right under the Confrontation Clause of the Sixth Amendment to the United States Constitution. Defendant acknowledges that he did not object to the admission of the doctor's testimony at trial, but he contends that we should review it as plain error. In response, the state argues, among other things, that a reasonable dispute exists about whether G's statements to Chervenak were "testimonial" under *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004).

■　　　We agree with the state. We will review an unpreserved error of law only if the question of law at issue is obvious—that is, not reasonably in dispute. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991). In *Crawford*, the Supreme Court held that the confrontation right guaranteed by the Sixth Amendment requires that "testimonial" hearsay of an unavailable declarant is not admissible unless the defendant has had a prior opportunity to cross-examine the declarant. 541 US at 68. The Court declined to explain what "testimonial" means, beyond concluding that statements elicited during police interrogation qualify. However, in *Davis v. Washington*, ___ US ___ , 126 S Ct 2266, 165 L Ed 2d 224 (2006), the Court refined the distinction between testimonial and nontestimonial hearsay. It explained that, where the circumstances show that the primary purpose of the statements was not to assist the police in investigating a crime, but rather to "enable police assistance to meet an ongoing emergency," the statements are not testimonial. ___ US at ___ , 126 S Ct at 2273.

In this case, a reasonable dispute exists as to whether G's statements were made primarily for purposes of diagnosis and treatment rather than to assist in a police investigation. There were no police officers present when Chervenak interviewed G, and there is no indication in the record that Chervenak conducted the interview specifically for use in later criminal proceedings or was otherwise acting as an agent or proxy for the police.

This is not a case like *State v. Pitt (A120428)*, 209 Or App 270, 147 P3d 940 (2006), in which we held that the trial court committed plain error in admitting into evidence two

interviews with child victims that were videotaped at a child advocacy center. There, the record indicated that the center operated in partnership with the district attorney's office, provided a number of services related to child abuse investigation, housed a grand jury, and did not offer mental health treatment. It further indicated that the interviews were videotaped by a police officer with the intent that the tapes would be turned over to law enforcement or Child Protective Services. *Id.* at 273. We concluded that the interviews were "conducted for the express purpose of furthering a police investigation, with a police officer recording them and with the interviewer explicitly attempting to solicit information from the children that would be useful for [the] defendant's prosecution." *Id.* at 279. We therefore held that the children's videotaped statements were "unquestionably testimonial, because their primary purpose was to 'establish or prove past events potentially relevant to later criminal prosecution.'" *Id.* (quoting *Davis*, ___ US at ___ , 126 S Ct at 2273). *See also State v. Mack*, 337 Or 586, 593, 101 P3d 349 (2004) (statements were testimonial given that they were made to a DHS worker who took over a police interview when the interviewing officer was unable to establish dialogue with the victim and who elicited statements so that the police could videotape them for use in a criminal proceeding).

Because the record before us does not reflect facts such as those that were established in *Pitt*, we cannot conclude that it is beyond dispute that G's statements to Chervenak were testimonial. In short, G's statements to Chervenak are arguably akin to the statements in *Davis* that were made primarily for a purpose other than to assist in a police investigation. It follows that admission of the statements into evidence was not plainly erroneous.

In his third assignment of error, defendant argues that the trial court violated his right to a jury trial by sentencing him under Measure 11[2] rather than under the sentencing guidelines. We reject that assignment of error without discussion. The trial court did not err in imposing sentence as it did.

Affirmed.

---

[2] Measure 11 is codified at ORS 137.700 to 137.707.