COMMONWEALTH of Pennsylvania,
Appellee

v.

Rickey Lee ALLSHOUSE,
Jr., Appellant.

Superior Court of Pennsylvania.

Argued Nov. 14, 2006.
Filed April 18, 2007.
Reargument Denied July 2, 2007.

David B. Chontos, Chontos & Chontos, P.C., Turtle Creek, for appellant.

Jeffrey D. Burkett, Jefferson County Dist. Atty's. Office, Brookville, for appellee.

BEFORE: ORIE MELVIN, McCAFFERY and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 Ricky Lee Allshouse, Jr., appeals from the November 2, 2005, judgment of sentence of one to three years incarceration, a fine, various costs, and restitution imposed after a jury found him guilty of simple assault [1] and endangering the welfare of a child.[2]

¶ 2 On or about May 26, 2004, the Brookville Police Department was asked

---

1. 18 Pa.C.S.A. § 2701(a)(1).

2. *Id.* at § 4304.

by Jefferson County Children and Youth Services (CYS) to investigate a suspected assault on a minor, J.A., at appellant's residence. Record, No. 2, Affidavit of Probable Cause. Upon investigation, police learned that on May 20, 2004, appellant and J.A.'s mother were arguing in the family home. Appellant was shouting from the living room, where his seven-month-old son, J.A., and his twin brother were lying in a playpen. J.A.'s mother told police she heard appellant sit on a recliner in the living room and, minutes later, heard him get up from the recliner. The sound of the recliner rocking back on the floor was immediately followed by a "snapping/slapping noise," which was followed by the sound of J.A. crying. Upon hearing this series of noises, J.A.'s mother proceeded to the living room and found appellant retreating towards his bedroom. She also discovered J.A.'s four-year-old sister, A.A., had entered the playpen and was holding J.A.'s head on her lap. *Id.*

¶ 3 Immediately thereafter, J.A. was taken to the Brookville emergency room by his mother. Record, No. 2, Affidavit of Probable Cause. Upon examination, it became apparent J.A. had suffered a spiral fracture to the right humerus caused by "sharp and severe twisting of the arm." Shortly after J.A.'s arrival at the emergency room, hospital officials contacted CYS caseworker John Geist to assess J.A.'s welfare. N.T., 9/19/05, at 93. After assessing the situation and interviewing J.A.'s mother, Geist removed J.A. and his siblings from the family home and placed them with their paternal grandparents. *Id.* at 95, 104.

¶ 4 On May 27, 2004, after appellant informed Geist that A.A. could have possibly been responsible for J.A.'s injury, Geist decided to interview A.A. N.T., 9/19/05, at 104. When Geist asked A.A. if appellant had broken J.A.'s arm, A.A. "seized up quite a bit and said yes." *Id.* at 108. When Geist asked A.A. how appellant went about breaking J.A.'s arm, A.A. "proceeded to grab ahold of my arm, pull it, and twist." *Id.* at 109. After the interview was cut short by the intervention of appellant's brother, Geist returned to CYS, notified his supervisor, and recommended that A.A. be interviewed by Dr. Allen Ryen, a licensed child psychologist. *Id.*

¶ 5 On June 8, 2004, Dr. Ryen interviewed A.A. N.T., 9/19/05, at 156–157. Dr. Ryen's practice entails treating private patients, working on the Pennsylvania Megan's Law Board, and consulting for various government agencies. *Id.* at 140. During the interview, Dr. Ryen asked A.A. whether something had "happened" to J.A. *Id.* at 145. A.A. replied "Daddy hurt him." *Id., accord N.T.,* Tender Years Hearing, 9/16/05, at 31. A.A. then demonstrated how J.A. was injured. *Id.*

¶ 6 Shortly after these interviews were conducted, appellant was arrested and charged with aggravated assault,[3] simple assault,[4] endangering the welfare of a child,[5] reckless endangerment of another,[6] and harassment.[7] Record, No. 2, Police Criminal Complaint.

¶ 7 On September 16, 2005, the trial court held a tender years hearing pursuant to 42 Pa.C.S.A. § 5985.1, **Admissibility of certain statements,** also known as the Tender Years Hearsay Act (the Act) to determine whether the statements given by A.A. to Geist and Dr. Ryen were admissible under the tender years exception to the hearsay rule. By Order dated Sep-

---

**3.** 18 Pa.C.S.A. § 2702(a)(1).

**4.** *Id.* at § 2701(a)(1).

**5.** *Id.* at § 4304.

**6.** *Id.* at § 2705.

**7.** *Id.* at § 2709(a)(1).

tember 16, 2005, the trial court deemed A.A.'s statements admissible, thereby allowing both Geist and Dr. Ryen to testify about the contents of their interviews with A.A. Record, No. 30.[8] On September 19, 2005, appellant filed a motion to reconsider asserting A.A.'s statements were testimonial hearsay and, hence, inadmissible pursuant to the United States Supreme Court's ruling in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

¶ 8 At trial, in addition to allowing both Geist and Dr. Ryen to testify about A.A.'s statements, the trial court also admitted testimony from pediatrician Dr. Holly Davis. N.T., 9/19/05, at 170. Dr. Davis testified that J.A.'s spiral fracture was caused by tremendous force which could not have been generated by a four-year-old child. *Id.* at 191. Notably, Dr. Davis testified she had reviewed Dr. Ryen's records and agreed that the discussion in his report of how A.A. described the twisting and pulling action performed on J.A. by appellant was consistent with the findings she made after examining J.A.'s x-rays. *Id.* at 196.

¶ 9 On September 20, 2005, the jury convicted appellant of simple assault and endangering the welfare of a child and found him not guilty of aggravated assault and recklessly endangering another person. Thereafter, the trial court denied appellant's motion for reconsideration, thus concluding A.A.'s statements to both Geist and Dr. Ryen were "non-testimonial" hearsay within the meaning of *Crawford.* Record, No. 34.

¶ 10 On November 14, 2005, appellant filed post-sentence motions seeking a mod-

ification of sentence and seeking, *inter alia,* a judgment of acquittal on the endangering the welfare of a child conviction. Record, No. 43. By Opinion and Order of March 9, 2006, the court vacated an award of restitution payable to CYS but otherwise denied the motions. Record, No. 50. Appellant perfected a timely appeal with this Court and now raises the following issues for our review:

1. Are statements from a non-testifying child witness who was never cross-examined testimonial and thus excludable under the confrontation clause as required by *Crawford v. Washington?*

2. Did the admission of statements under the Tender Years Hearsay Act violate the ex post facto clause?

3. Can a fine be upheld when the court does not consider the statutory requirements of [42 Pa.C.S.A.] Section 9726 [**Fine**]?

4. Can a restitution and costs order be upheld when the Commonwealth does not satisfy its burden of proof and where the Court fails to direct how the restitution should be paid?

5. Can an order to pay Sheriff transportation costs be upheld when there is no statutory authority and does a policy imposing such costs violate the sentencing code's demand for individualized sentence?

Appellant's brief at 6.

### Crawford, Davis, and Testimonial versus Non–Testimonial Hearsay

¶ 11 In considering appellant's first issue which specifically references *Crawford, su-*

---

**8.** A prerequisite for admitting hearsay evidence under the tender years exception is that the child witness must either testify or be "unavailable" within the meaning of the statute. *See* 42 Pa.C.S.A. § 5985.1(a)(2)(ii). The trial court, in ruling A.A.'s statements to Geist

and Dr. Ryen were admissible, necessarily found A.A. was unavailable to testify. Appellant does not attack this determination on appeal and concedes A.A. was unavailable. Appellant's brief at 44.

*pra,* we are required to apply the very recent United States Supreme Court decision in *Davis v. Washington,* —— U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), for one of the first times in this Commonwealth. *See In re S.R.,* 2007 Pa.Super. 79, 920 A.2d 1262 (2007). Hence, our standard of review over the trial court's admission of A.A.'s statements to Geist and Dr. Ryen is *de novo* and our scope of review is plenary. *Commonwealth v. Corban Corp.,* 909 A.2d 406 (Pa.Super.2006).

¶ 12 By way of historical development, in 1980 the United States Supreme Court handed down *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which held the admission of hearsay testimony made by an unavailable witness against a criminal defendant is admissible under the Confrontation Clause [9] if the statement is surrounded by "adequate indicia of reliability." Such indicia exist, according to *Roberts,* when the testimony being considered either fits within a "firmly rooted hearsay exception" or contains "particularized guarantees of trustworthiness." *Roberts, supra* at 66, 100 S.Ct. 2531.

¶ 13 Almost 25 years later, in the summer of 2004, the Supreme Court overruled *Roberts,* at least in part. *Crawford, supra* at 67, 124 S.Ct. 1354 (referring to *Roberts* as a "fundamental failure" on the Court's part to interpret the Constitution). In so doing, the Court held:

Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law-as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. *Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.* We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.

*Crawford, supra* at 68, 124 S.Ct. 1354 (emphasis added and internal reference omitted).[10]

¶ 14 Predictably, lower courts wrestled with the distinction between testimonial and non-testimonial hearsay in the wake of *Crawford.*[11] Subsequently, in the summer of 2006, the Court clarified this distinction in *Davis,* which was handed down while this appeal was pending, by stating the following:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the *primary purpose* of the interrogation is to enable police assistance to meet an ongoing emergency.

---

9. U.S. Const. amend. VI.

10. The statement at issue in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), was rendered by the defendant's wife (Crawford) during a formal police interrogation at the station house. *Id.* at 36, 124 S.Ct. 1354. Due to the fact that the spousal privilege barred the declarant from testifying, the prosecution sought to introduce the declarant's statements to undermine the defendant's assertion of self-defense in a sub-

sequent trial for assault and attempted murder. *Id.* at 40–41, 124 S.Ct. 1354. The Court held the declarant's statement was inadmissible as testimonial hearsay and reversed defendant's judgment of sentence. *Id.* at 68–69, 124 S.Ct. 1354.

11. *See e.g., Commonwealth v. Holton,* 906 A.2d 1246, 1253–1255 (Pa.Super.2006), *discussing United States v. Hendricks,* 395 F.3d 173, 181 (3d Cir.2005).

They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, *and* that the *primary purpose* of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis, supra* at 2273–2274 (emphasis added).

¶ 15 The *Davis* Court was careful to note that statements made in the absence of interrogation could still conceivably be considered testimonial. *Id.* at 2274 n. 1. The Court further noted that its holding made it "unnecessary to consider whether and when statements made to someone other than law enforcement personnel are 'testimonial.'"[12] *Id.* Recognizing, therefore, that non-testimonial statements can be given to *law enforcement officials* pursuant to *Davis,* there can be little question that statements offered to non-law enforcement witnesses can be deemed non-testimonial.

¶ 16 In order to properly analyze the question of whether A.A.'s statements to Geist and Dr. Ryen were testimonial, we must further discern the exact nature of the Court's "primary purpose" test. The most fertile ground for this discernment lies in the Court's initial application of the primary purpose test in *Davis.*

¶ 17 *Davis* was a consolidated appeal wherein the Court found one set of statements under examination, made by a wife (Hammon) to police officers dispatched to investigate a domestic disturbance in a battery affidavit, were testimonial and, hence, non-admissible under the Confrontation Clause. *Id.* at 2278. Concurrently, however, the Court found a second set of statements made by a spousal abuse victim (McCottry) to a 911 operator were non-testimonial. *Davis, supra* at 2277.

¶ 18 In reaching these findings, the Court implicitly emphasized a number of factors that were consistent with the formulation, outlined above, wherein statements are considered testimonial (in the police interrogation context) "when the circumstances objectively indicate that there is no such ongoing emergency, *and* that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis, supra* at 2273–2274.

**12.** An exhaustive research effort indicates there is no case currently on the Supreme Court's docket that raises the current issue—either on a grant of *writ of certiorari* or pending a decision on whether *certiorari* should be granted.

Notably, however, in *Whorton v. Bockting,* —— U.S. ——, 127 S.Ct. 1173, 167 L.Ed.2d 1, 75 USLW 4121 (2007), it was determined the *Crawford* rule does not apply retroactively in that it announced a new rule of criminal procedure.

Courts in a few of our sister states did consider issues similar to the one *sub judice* after *Davis* was handed down. In every instance, these courts held a child's out-of-court statements were inadmissible testimonial hearsay, albeit each in a unique context and for unique reasons. *See e.g., State v. Hooper,* 2006 Ida.App. Lexis 83, —— P.3d ——, 2006 WL 2328233 (Idaho Ct.App.2006) (holding a child sex abuse victim's statement to a nurse was inadmissible as testimonial hearsay because the nurse was acting at the behest of law enforcement); *Missouri v. Justus,* 205 S.W.3d 872, 2006 Mo. Lexis 136 (Mo.2006) (holding, in part, that videotaped testimony taken from a child by a licensed social worker, admittedly for law enforcement purposes, was inadmissible because "there was not an ongoing emergency and because the primary purpose of the interrogations was to prove past events potentially relevant to a later criminal prosecution."); *New Jersey v. Buda,* 389 N.J.Super. 241, 912 A.2d 735, 2006 N.J.Super. Lexis 338 (App.Div.2006) (holding an injured child's statement to a social worker was inadmissible through the testimony of a social worker but a similar statement was admissible through the testimony of the child's mother); *Oregon v. Pitt,* 209 Or.App. 270, 279, 147 P.3d 940 (2006) (holding video-

¶ 19 For example, in analogizing Crawford's statement, which was found to be inadmissible, with Hammon's statement, the Court noted:

What we called the "striking resemblance" of the *Crawford* statement to civil-law *ex parte* examinations is shared by [Hammon's] statement here. Both declarants were actively separated from the defendant—officers forcibly prevented [Mr. Hammon] from participating in the interrogation. Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial.

*Davis, supra* at 2278 (internal citation omitted).

¶ 20 In distinguishing Crawford's statements from McCottry's statements to the 911 operator, the Court, in relevant part, noted the following:

And finally, the difference in the level of formality between the two interviews is striking. Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe.

*Davis, supra* at 2276–2277.

¶ 21 The Court's application of the primary purpose test, as gleaned from the above passages, implies that a number of factors must *all* be considered in determining whether a statement is testimonial; the use of the word "and" indicates that both prongs of the test must be satisfied before a statement can be considered testimonial. In satisfying the first half of the *Davis* test by determining whether the statement being examined was given during an ongoing emergency, only one factor needs to be examined—the temporal relation of the statement being examined to the wrong the statement describes. *See Davis, supra* at 2273–2274.

¶ 22 Satisfying the primary purpose prong of the *Davis* test, in contrast, encompasses examination of two factors. The first factor that must be considered is the objective intent of the declarant and the objective intent of the questioner in giving and eliciting the statement being considered. *Id.* ("Both statements *deliberately* recounted, *in response to police questioning*, how potentially criminal past events began and progressed.") *Davis, supra* at 2278 (emphasis added). Furthermore, the environment in which the statement was given, including the attendant formalities, must also be considered. ("And finally, the difference in the level of formality between the two interviews is striking ... McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even ... safe.") *Id.* at 2276–2277. In sum, the Court's primary purpose test seems to be a variant of the totality of the circumstances test with parameters that are more specifically defined.[13]

¶ 23 With this framework in mind, we turn to an analysis of the specific testimony at issue in this case.

taped testimony of two children was inadmissible as testimonial).

13. The ultimate effect of admitting a particular statement into evidence does not seem to be a dispositive factor in the analysis. This is logical because every inculpating statement, however it may come to eventually be defined, is damaging to a criminal defendant and, hence, using an effects test as a factor would be futile as it would always be satisfied.

### A.A.'s Statements to Geist

▮ ¶ 24 Geist testified he had initially met with appellant and his family when J.A. was in the hospital. N.T., Tender Years Hearing, 9/16/05, at 8. He said he made the decision to remove the Allshouse children from appellant's home after hearing inconsistencies in J.A.'s mother's story and listening to the concerns of the treating physician. N.T., 9/19/05, at 94. Geist testified that appellant had alleged, on May 27, 2004, A.A. had been the one responsible for J.A.'s broken arm. N.T., 9/19/05, at 128–129 ("It was brought to my attention from Ricky there might have been a possibility she may have caused the injury. So I wanted to talk to her to do an interview."). It was only after this allegation was leveled that Geist became interested in interviewing A.A.[14] *Id.*

¶ 25 Geist conducted the interview on the front porch of the Allshouse's home and he was dressed casually. N.T., 9/19/05, at 104, 106. He began the questioning by asking A.A. whether she remembered her brother being injured.

N.T., Tender Years Hearing, 9/16/05, at 11. When she replied that she did so remember, Geist then asked if J.A.'s twin brother had caused the injury. *Id.* When he was told no, he asked if J.A.'s mother had caused the injury. *Id.* After he was told no again, he asked A.A. if she herself had caused J.A.'s injury. *Id.* After being told no once more, Geist finally asked if appellant had caused the injury. *Id.* After A.A. informed Geist that appellant had broken J.A.'s arm, A.A. demonstrated how the injury was inflicted. *Id.* The interview came to an abrupt conclusion when one of appellant's brothers intervened and A.A. refused to continue talking. *Id.*

¶ 26 Examining the facts and circumstances of this interview leads us to the conclusion that A.A.'s statements are admissible as non-testimonial under *Crawford,* should a hearsay exception prove applicable. *See infra.* While we recognize Geist conducted the interview a full seven days after the assault, the intentions of Geist and A.A. as well as the attendant environmental factors indicate A.A.'s statements are, indeed, non-testimonial in nature.[15]

---

14. Geist testified that he first interacted with A.A. while transporting her, along with her siblings, to their grandparents' home for temporary placement. N.T., Tender Years Hearing, 9/16/05, at 13–14. There is no evidence, however, that Geist questioned A.A. at this point, even though it would have been the perfect opportunity to do so considering A.A. was under Geist's exclusive supervision and control.

15. There is some question as to whether A.A. was being abused in some way by her grandparents and other members of the family and, therefore, an argument could be made that an ongoing emergency *was* present. As discussed above, A.A. seized up when asked whether appellant had broken J.A.'s arm. "She started shaking. Closed body language. She was looking around to see if anyone heard her statement." N.T., Tender Years Hearing, 9/16/05, at 11. When appellant's brother interrupted her interview with Geist, A.A. immediately stopped talking. *Id.*

Additionally, Dr. Ryen testified that when he first met A.A. she immediately separated from her grandparents and gravitated towards him. "The grandparents seem to be upset and clearly some tension between [A.A.] and the grandparents. Almost immediately, she separated from the grandparents and put myself between her and the grandparents, which I find unusual. I'm a total stranger to this child." N.T., 9/19/05, at 143. Dr. Ryen got the impression A.A. had been "threatened or coerced" by somebody prior to his interview with her. N.T., Tender Years Hearing, 9/16/05, at 33. After conducting the interview with A.A., appellant's father apparently informed Dr. Ryen that A.A. had been the one who injured J.A. *Id.* at 34–35. The grandparents also discussed how children who misbehave "require spanking and things" in the presence of A.A. immediately after the interview. N.T., Tender Years Hearing, 9/16/05, at 49.

This evidence demonstrates A.A. was in some form of distress, although the degree to which this is so is not evident from the record

¶ 27 Presently, appellant does not dispute Geist's contention that he only wanted to interview A.A. after appellant accused the young girl of harming J.A., and it would be absurd to assume A.A. had intended to give statements for use in a legal proceeding. Geist's failure to interview A.A. when he had her under his supervision also indicates Geist's contention is credible and, hence, there is little question Geist's *primary purpose* in interviewing A.A. was not to establish past events which would be potentially relevant in a criminal trial, but to ensure both A.A. and her siblings' welfare was secure while they remained in the custody of their grandparents.[16] *See also, Agilera v. Indiana,* 862 N.E.2d 298, 306, 2007 Ind. App. Lexis 431, —— (Ind.Ct.App.2007) (defining non-testimonial statements as ". . . statements [that] were made for purposes of gathering information about what happened and finding out if the child was harmed, not in preparation to prosecute"). In addition thereto, Geist did not report A.A.'s statements to law enforcement but, rather, notified his CYS supervisor of

them after the interview, even though he had the option of reporting the incident to the police.[17] N.T., 9/19/05, at 109.

¶ 28 Furthermore, the environment surrounding the interview does not indicate A.A.'s statements were testimonial. As noted above, Geist was dressed casually and the interview was conducted on neutral ground. Additionally, Geist had no control over the interviewing environment—as his inquiries were cut short after appellant's brother intervened. *See Davis, supra* at 2278. There was simply no semblance of formality during the interview.

¶ 29 In sum, we do not view the Supreme Court's primary purpose test as being reliant solely on the temporal relationship between the statement and the wrong the statement describes and, instead, view the test as encompassing the broader range of factors applied in *Davis.* Inasmuch as this is the case, we conclude Geist's testimony is non-testimonial. In so holding, we wish to emphasize that we are not answering the broader question of "whether and when" statements made to a party not involved with law enforcement is

---

and there is a question of whether imminent danger was present. This distress was the result of her being a witness to appellant's aggression towards J.A.

16. It goes without saying that Geist was not planning on using the information gathered through the interview to initiate a prosecution against four-year-old A.A.

17. Geist followed the statutory procedure in notifying his CYS supervisor, which requires him to report suspected instances of child abuse to the Department of Public Welfare. *See* 23 Pa.C.S.A. § 6311, **Persons required to report suspected child abuse;** *see also,* 23 Pa.C.S.A. § 6313, **Reporting procedure.** A diligent research effort has failed to uncover a statutory provision requiring CYS workers to report suspected incidents of child abuse directly to law enforcement officials, although such reporting is permissible. *See generally,* 23 Pa.C.S.A. § 6313; *see also* 23 Pa.C.S.A. § 6334, **Disposition of complaints received.**

Geist did, however, testify that he was a part of a meeting with the Jefferson County District Attorney held on June 4, 2004. N.T., 9/19/05, at 116. Geist further testified that the District Attorney instructed him during the meeting to be harsher with J.A.'s mother in an attempt to get her to admit her knowledge of the incident. *Id.* While this testimony indicates CYS officials and the D.A.'s office began to work together at some point during this case, there is no evidence of record demonstrating this cooperative effort commenced prior to June 4, 2004. Rather, as alluded to above, the evidence strongly indicates the effort did not commence prior to this time and, that even if it did, the evidence strongly indicates the effort to lean on potential witnesses did not include A.A., as Geist had the uninhibited opportunity to question her and her siblings while transporting them to the grandparents' home and refrained from doing so. *See* footnote 13, *supra.*

testimonial, as that broad question is more properly left for the United States Supreme Court. We are merely holding that A.A.'s statements to Geist are non-testimonial in this particular case. The question of their admissibility is dealt with *infra*.

### A.A.'s Statements to Dr. Ryen

■ ¶ 30 A.A.'s statements to Dr. Ryen present a close question. Dr. Ryen interviewed A.A. on June 8, 2004, by which time any ongoing emergency had arguably abated.[18] *See Davis, supra* at 2273–2274. Dr. Ryen testified that he sits on this Commonwealths' Megan's Law Board, is an active court officer in three counties (including Jefferson, where J.A. was injured), and is active in performing child custody mediations in three counties (including Jefferson). N.T., Tender Years Hearing, 9/16/05, at 26. When defense counsel asked Dr. Ryen what the goal of his interview with A.A. was, Dr. Ryen acknowledged the interview was being conducted for "investigative purposes." N.T., 9/19/05, at 149. He further acknowledged that he conducted the interview suspecting appellant was the perpetrator and A.A. was a witness. *Id.* at 150.

¶ 31 Conversely, Dr. Ryen testified that he considered A.A. to be a patient. N.T., 9/19/05, at 158. He noted that the interview was conducted in his office, which is "sort of a big play room." N.T., Tender Years Hearing, 9/16/05, at 29. He further testified that he asked A.A., "Did some-

thing happen to your baby brother?"—to which A.A. replied spontaneously "Daddy hurt him." N.T., 9/19/05, at 145.

¶ 32 After careful consideration, we conclude the evidence of record is insufficient to determine whether A.A.'s statements to Dr. Ryen are testimonial as it is impossible to determine what Dr. Ryen's primary purpose was in conducting the interview.[19] Whatever the case may be, it is unnecessary to determine whether A.A.'s statements to Dr. Ryen are testimonial because even if they are, thereby being inadmissible, the admission of these statements constitutes harmless error.

¶ 33 In a recent case, an *en banc* panel of this Court outlined the central tenets of the harmless error doctrine as follows:

This Court has stated that an error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict. Under this approach, a reviewing court first determines whether the untainted evidence, considered independently of the tainted evidence, overwhelmingly establishes the defendant's guilt. If "honest, fair minded jurors might very well have brought in not guilty verdicts," an error cannot be harmless on the basis of overwhelming evidence. Once the court determines

---

18. We use the word "arguably" because there is a question as to whether A.A. was being abused in some way by her grandparents and/or other members of the family as discussed at length above. *See* footnote 15, *supra*.

19. Appellant seemingly does not challenge the admission of the portion of Dr. Davis' testimony that discussed Dr. Ryen's interview report. *See* Pa.R.Evid. 805, **Hearsay within hearsay.** Even if he had, however, we would find this admission to constitute harmless er-

ror based on the analysis of Dr. Ryen's testimony contained herein.

Furthermore, Dr. Davis rendered an opinion that A.A. could not have possibly caused J.A.'s fracture prior to testifying that she agreed with Dr. Ryen's report and its rendering of A.A.'s statements. N.T., 9/19/05, at 195–196. This admissible opinion, standing alone, inculpates appellant because the dispute is whether he or A.A. is the perpetrator—no one has alleged A.A.'s mother, the only other adult capable of producing the requisite force present during the assault, broke J.A.'s arm.

that the evidence of guilt is overwhelming, it then decides if the error was so insignificant by comparison that it could not have contributed to the verdict. We have cautioned that:

"A conclusion that the properly admitted evidence is 'so overwhelming' and the prejudicial effect of the .... error is 'so insignificant' by comparison, that it is clear beyond a reasonable doubt that the error is harmless, is not to be arrived at lightly."

Accordingly, we have been reluctant to find an error harmless on the basis of overwhelming evidence.

*Commonwealth v. Drummond*, 775 A.2d 849, 853 (Pa.Super.2001), *quoting Commonwealth v. Rasheed*, 536 Pa. 567, 570–571, 640 A.2d 896, 898 (1994).

¶ 34 In this case, the untainted evidence presented by the Commonwealth is so overwhelming that no reasonable juror would have found for appellant had he or she only considered this untainted evidence. Dr. Burke, J.A.'s treating physician in the emergency room, testified that he was immediately suspicious about J.A.'s injury, and this suspicion led him to report the case to CYS. N.T., 9/19/05, at 34. J.A.'s mother vividly testified about the progression of events leading up to J.A.'s injury, and when asked why she no longer resides with appellant, she answered "Because he broke my son's arm." N.T., 9/19/05, at 42. The Commonwealth also offered the deposition testimony of the radiologist who read J.A.'s x-ray, Dr. Paisley, who testified that spiral fractures are indicative of child abuse. N.T., 9/19/05, at 73, *admitting* Deposition Testimony,

9/12/05, Dr. Kevin John Paisley, M.D., at 24. Additionally, the Commonwealth offered Geist's testimony, which included A.A.'s statements to him—thereby further incriminating appellant.[20] Finally, the Commonwealth offered the medical opinion of board certified pediatrician Dr. Davis, which provided that A.A. was physically incapable of causing J.A.'s spiral fracture. When this evidence is considered in its totality, it becomes clear Dr. Ryen's testimony pertaining to A.A.'s statement is merely duplicative.

¶ 35 Appellant, on the other hand, offered no exculpatory evidence, not even a single witness. There was no attempt to substantiate the allegation that A.A. could have caused the injury—either through medical testimony or through personal testimony. Indeed, appellant's stance on this appeal indicates he his hanging his hopes of exoneration on the allegation that the trial court erred as a matter of law—not on the relative strength of the evidence of record.[21]

¶ 36 Consequently, even if we assume *arguendo* that A.A.'s statements to Dr. Ryen are testimonial and non-admissible, the trial court's error in admitting them constitutes harmless error beyond a reasonable doubt. *See Drummond, supra* at 853.

### *Ex Post Facto* Application of the Tender Years Hearsay Act

■ ¶ 37 Inasmuch as the trial court found A.A.'s statements to Geist were non-testimonial, the trial court was forced to find an exception to the hearsay rule in order to admit A.A.'s statements as they were still classic hearsay.[22] *See* Pa.

20. A.A.'s statements are admissible as discussed *infra*.

21. Appellant devotes seven pages of his ninety-nine page brief to attacking the imposition of $100 in fees as part of his sentence. Appellant's brief at 64–70. It is inconceivable that he would not attack the sufficiency and

weight of the evidence had there been a chance his judgment of sentence could be reversed on such grounds.

22. We have already dealt with the admission of A.A.'s statements to Dr. Ryen, finding their admission constituted harmless error even if

R.Evid. 801(c), **Definitions.** The exception upon which the trial court relied is found in the Tender Years Hearsay Act, *supra,* which provides:

(a) **General rule.**—An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing any of the offenses enumerated in 18 Pa.C.S. Chs. 25 (relating to criminal homicide), 27 (relating to assault), 29 (relating to kidnapping), 31 (relating to sexual offenses), 35 (relating to burglary and other criminal intrusion) and 37 (relating to robbery), not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:

(1) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2) the child either:

(i) testifies at the proceeding; or

(ii) is unavailable as a witness.

42 Pa.C.S.A. § 5985.1, **Admissibility of certain statements.**

¶ 38 Here, appellant attacks the trial court's application of this provision by asserting that it violated the prohibition against *ex-post facto* laws because at the time the charges were filed against him, the precursor to the current form of 42 Pa.C.S.A. § 5985.1 provided that an out-of-court statement made by a child victim or witness would only be admissible under the provision if the alleged act was "performed with or on the child by another." *See* 2004 Pa. Legis. Serv. Act. 2004–87. Appellant argues the trial court's application of the current provision, passed after he was charged, constitutes *ex post facto*

application because it "alters the legal rules of evidence, and receives less, or different, testimony than the law required at the time of the commission of the offence, in order to convict the offender." *See Calder v. Bull,* 3 U.S. 386, 390, 1 L.Ed. 648 (1798).

¶ 39 Appellant's contention raises a pure question of law and, thus, our standard of review is *de novo* and our scope of review is plenary. *Corban Corp., supra* at 410. The argument invites us to consider whether the new version of the Act allows courts of this Commonwealth to "receive less, or different, testimony" than did the prior version of the Act. We find such an exercise would be superfluous, even if we were to assume, as appellant does, that the phrase "with or on" contained in the precursor to the current Act forecloses the possibility of applying the tender years exception to a statement from a child who was not directly acted upon by the perpetrator.

¶ 40 As discussed above, in 1980 the United States Supreme Court in *Ohio v. Roberts* held that the admission of hearsay testimony made by an unavailable witness against a criminal defendant is admissible under the Confrontation Clause if the statement is surrounded by an "adequate indicia of reliability." *Roberts, supra* at 66, 100 S.Ct. 2531. Such indicia exist, according to *Roberts,* when the testimony being considered either fits within a "firmly rooted hearsay exception" or contains "particularized guarantees of trustworthiness." *Id.*

¶ 41 The trial court, by applying the Act to the current controversy, was required to find A.A. was unavailable and was also required to find indicia of reliability.[23] 42

---

it was assumed their admission was erroneous. Consequently, we will not analyze the admission of these statements anew.

**23.** As previously noted, appellant concedes A.A. was unavailable.

Pa.C.S.A. § 5985.1. The record demonstrates the indicia of reliability ultimately found by the trial court was not the Tender Years Hearsay Act itself, in accordance with the aspect of the *Roberts* definition that allows reliability to be found in a "firmly rooted hearsay exception." Indeed, in finding Geist's testimony admissible, the Honorable President Judge Foradora noted: "I also find that Mr. Geist's statement, because of the content, location, and nature of the statement, that it's also reliable." N.T., Tender Years Hearing, 9/16/05, at 53. Appellant does not challenge these findings on appeal.

¶ 42 Consequently, the trial court's finding of reliability, which was not in the form of a "firmly rooted hearsay exception" and was premised on a finding of "particularized guarantees of trustworthiness," satisfies *Roberts,* which was binding precedent when appellant was charged and remains binding precedent in analyzing the admission of non-testimonial hearsay today.[24] Thus, even if we assume *arguendo* the trial court's application of the Act constitutes an *ex post facto* violation, this application is inconsequential, as the trial court simply could have applied *Roberts* and reached the identical result. There is no reason to reverse and remand, as the trial court could simply reach the same result by stating that it is applying *Roberts.* We decline the opportunity to delay the resolution of this case simply so the trial court

can correct itself semantically. We therefore find Geist's testimony to be admissible.[25]

### Judgment of Sentence

■ ¶ 43 Appellant's final four issues pertain to the trial court's imposition of fines, restitution, costs of prosecution, and transportation costs. At the outset, we note that sentencing is a matter vested within the sound discretion of the trial judge, and a sentence will not be disturbed absent a manifest abuse of discretion. *Commonwealth v. Perry,* 883 A.2d 599, 602 (Pa.Super.2005). In order to demonstrate an abuse of discretion has occurred, appellant must establish, by reference to the record, that the trial court ignored or misapplied the law, exercised its judgment for untoward reasons, or arrived at a manifestly unreasonable decision. *Id.*

■ ¶ 44 Appellant first contends the trial court erred by failing to consider the mandates of 42 Pa.C.S.A. § 9726(c), **Fine,** before imposing a $100 dollar fine. Inasmuch as this challenge is a challenge to the legality of the sentence (i.e., the fine was imposed unlawfully), appellant's challenge is brought as of right. *See Commonwealth v. Mouzon,* 571 Pa. 419, 812 A.2d 617, 622 (2002) (plurality), *citing* 42 Pa. C.S.A. § 9781, **Appellate review of sentence** (contrasting appeals of right based on legal challenges from appeals from the

---

**24.** The Federal Circuit Courts of Appeals that have considered the question of whether the *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), analysis governs the admission of non-testimonial hearsay evidence have unanimously held or assumed it does and this consensus includes the Third Circuit. *See e.g., United States v. Feliz, et al.,* 467 F.3d 227, 71 Fed.R.Evid. Serv. (Callaghan) 734, —— (2d Cir.2006); *Summers v. Dretke,* 431 F.3d 861, 877 (5th Cir.2005); *United States v. Hinton,* 423 F.3d 355, 358 n. 1 (3d. Cir.2005) ("Furthermore, the admission of non-testimonial evidence is still gov-

erned by *Roberts.")* (citations omitted); *United States v. Brun,* 416 F.3d 703, 707 (8th Cir.2005); *United States v. Franklin,* 415 F.3d 537, 546 (6th Cir.2005) (citations omitted); *Horton v. Allen,* 370 F.3d 75, 84 (1st Cir. 2004).

**25.** We recognize the consequence of our holding is that no *ex post facto* challenge to the application of the current version of the Act will be worth intensive review, provided trial courts continue to find indicia of reliability based on circumstances and not hearsay exceptions.

discretionary aspects of a sentence, which can only be brought by grant of allocatur), *accord Commonwealth v. Thomas,* 879 A.2d 246, 264 (Pa.Super.2005).

¶ 45 Appellant argues the trial court erred in failing to apply section 9726(c), which requires a court to consider a defendant's present and future solvency and whether a fine will prevent a defendant from paying restitution before imposing a fine. The Commonwealth, on the other hand, asserts the trial court considered the work history outlined in appellant's pre-sentencing investigation report and, as such, complied with the statute.

¶ 46 *Commonwealth v. Thomas,* 879 A.2d 246 (Pa.Super.2005), is directly on point and requires us to vacate the trial court's imposition of the fine and remand for specific findings in accordance with section 9726(c) to determine an appropriate fine. In *Thomas,* we rejected the identical argument raised by the Commonwealth and found a trial court must enter specific findings that would allow it to determine whether a defendant could pay a specific amount in fines. *Id.* at 264.[26] On remand, the trial court is charged with conducting an inquiry as outlined in section 9726 to determine what amount appellant should be fined.

■ ¶ 47 Appellant next alleges the Commonwealth did not meet its burden of proof in asserting appellant was obliged to pay restitution to the Crime Victims Compensation Fund. This challenge also implicates the legality of appellant's sentence and, as such, is brought as of right. *See Mouzon, supra* at 622, *accord Commonwealth v. Redman,* 864 A.2d 566, 569 (Pa.Super.2004).

¶ 48 Appellant asserts the trial court's Order, requiring him to pay $1,000 in restitution to the Crime Victims Compensation Fund, was unsupported by the evidence of record. He further contends the court erred by failing to require the Commonwealth to give a recommendation on restitution.

¶ 49 This Court has noted that although the statutory requirement is to award "full" restitution, the amount of full restitution must be arrived at through the adversarial system where the defendant is afforded due process. *Commonwealth v. Ortiz,* 854 A.2d 1280, 1282 (Pa.Super.2004) *(en banc).* Unless the statute under which a defendant is convicted contains a restitution provision, the Commonwealth is required to make a recommendation to the court prior to sentencing concerning the amount of restitution to be ordered. *See Redman, supra* at 570, *accord* 18 Pa.

---

**26.** While it is true that the pre-sentencing investigation report was not part of the certified record in *Commonwealth v. Thomas,* 879 A.2d 246 (Pa.Super.2005), whereas the attendant report is a part of the certified record in the matter *sub judice,* this distinction does not alter our decision. Appellant's pre-sentencing report merely reads "Current Employment/Source of Income: Rick has been self employed as an auto mechanic for the past 10 years. He also is a welder." Record, No. 50.

The trial court stated that, in arriving at the amount of the fine imposed, it considered both the report and appellant's "implication" that he possessed "unreported marketable skills." Trial Court Opinion and Order on Defendant's Post–Sentence Motions, Foradora, P.J., 3/09/06, at 1–2.

Obviously, this bland evidence is wholly insufficient to establish what an appropriate fine would be. Thus, although we are loath to expend judicial resources on the reconsideration of a fine that would be considered *de minimis* to most, we note that our precedent strongly suggests we strictly adhere to the mandates of 42 Pa.C.S.A. § 9726(c). *See Thomas, supra* at 264, *accord Commonwealth v. Gaskin,* 325 Pa.Super. 349, 472 A.2d 1154, 1158 (1984). Moreover, this matter must be remanded for other purposes, as discussed *infra.*

C.S.A. § 1106, **Restitution for injuries to person or property** (c) **Mandatory restitution (4)(i).**

¶ 50 The statutes under which appellant was convicted do not contain restitution provisions. *See* 18 Pa.C.S.A. § 2701 and § 4304 *supra.* Further, the record contains no indication the Commonwealth recommended any amount for restitution. *See generally,* N.T. Sentencing Hearing, 11/02/05, at 25. Thus, we are constrained to vacate the award of restitution in the face of unambiguous statutory language and remand for a determination as to the appropriate amount of restitution to be awarded. "It *shall* be the responsibility of the district attorneys of the respective counties to make a recommendation to the court at or prior to the time of sentencing as to the amount of restitution to be ordered." 18 Pa.C.S.A. § 1106(c)(4)(i) (emphasis added.) Appellant's allegation, that the trial court erred by failing to concoct a "method" for repaying restitution under 18 Pa.C.S.A. § 1106(c)(2)(ii), is moot and warrants no further consideration inasmuch as we have determined a remand is necessary to determine the amount of restitution owed.[27]

■ ¶ 51 As to the costs of prosecution,[28] appellant contends the trial court erred in awarding the costs to the Commonwealth pursuant to 16 P.S. § 1403, **Expenses incurred by district attorney,** because no evidence was introduced demonstrating how these costs were calculated or for what they were incurred.

¶ 52 Not only does the Commonwealth begrudgingly concede appellant is entitled to resentencing on this issue, the trial court acknowledges appellant did not receive a bill of costs from the Commonwealth. Appellee's brief at 29; Trial Court Opinion and Order on Defendant's Post–Sentence Motion, Foradora, P.J., 3/09/06, at 3 n. 2. Inasmuch as the law is well-settled in this regard, we must vacate the award of the costs of prosecution and remand for a determination as to the amount of costs that should be awarded in this case. *See Commonwealth v.Coder,* 490 Pa. 194, 415 A.2d 406, 410 (1980) (adopting a trial court's interpretation of 16 P.S. § 1403, *supra,* as requiring that any time a district attorney seeks to charge a defendant with costs he or she must provide the defendant with a bill of costs, thereby giving the defendant the opportunity to file exceptions thereto).

■ ¶ 53 Claiming no evidence of record exists to substantiate the costs, appellant also attacks the trial court's decision to order him to reimburse the sheriff's costs for transporting appellant to and from prison to attend hearings.

¶ 54 Appellant's contention is belied by the evidence of record, which demonstrates the sheriff submitted a transportation card to substantiate the $764.48 award of costs. Record, No. 38, Sheriff's Transport Card. Consequently, appellant's argument is frivolous and deserves no further consideration.

■ ¶ 55 Also with regard to the sheriff's transportation costs, appellant contends the trial court erred by ordering him to reimburse the costs without the express

---

**27.** We note that while 18 Pa.C.S.A. § 1106(c)(2) requires the trial court to specify an "amount and method" of restitution at sentencing, subsection (ii) of the provision states that the court "may" order restitution according to any schedule it deems just. Based on this language, we find no inherent problem with the court's decision to forego ordering a repayment schedule until after appellant is released from incarceration.

**28.** Like a challenge based on the contention an award of restitution is unsupported by the record is a challenge to the legality of the sentence, we analogously conclude this rationale can be applied to the imposition of costs.

statutory authority to do so. Again, this challenge is a legal challenge that is brought as of right. *Mouzon, supra* at 622, *accord Commonwealth v. Jacobs,* 900 A.2d 368, 373 (Pa.Super.2006).

¶ 56 Initially, we point out that the trial court noted it was imposing the sheriff's transportation costs not as a cost of prosecution but rather a rehabilitative measure pursuant to 42 Pa.C.S.A. § 9728(g), **Collection of restitution, reparation, fees, costs, fines and penalties.** Trial Court Opinion at 5.

¶ 57 At the time appellant's judgment of sentence was entered, that statutory authority stated:

> (g) **Costs, etc.**—Any sheriff's costs, filing fees and costs of the county probation department, clerk of courts or other appropriate governmental agency, including any reasonable administrative costs associated with the collection of restitution, shall be borne by the defendant and shall be collected by the county probation department or other appropriate governmental agency along with the total amount of the judgment and remitted to the appropriate agencies at the time of or prior to satisfaction of judgment.

42 Pa.C.S.A. § 9728(g).

¶ 58 In *Commonwealth v. Gaddis,* 432 Pa.Super. 523, 639 A.2d 462, 472 (1994), this Court held that the term "costs" in this provision did not include the imposition of the costs of prosecution itself but, rather, the terms merely included the costs associated with executing a money judgment from a defendant. This holding stood until 2006 when our General Assembly decided to amend the language of 42 Pa.C.S.A. § 9728(g) to include "transportation costs and other costs associated with

the prosecution" as express "costs" within the meaning of the provision. 2006 Pa. Legis. Serv. Act 2006–143. The Governor approved this amendment, effective immediately, on November 9, 2006. *Id.* From that date forward, therefore, *Gaddis* effectively was overruled, in relevant part, by legislative mandate. The remaining question, therefore, is whether the amended version of 42 Pa.C.S.A. § 9728(g) can be applied retroactively to uphold the trial court's award of transportation costs.[29]

■ ¶ 59 We conclude the amended version of 42 Pa.C.S.A. § 9728(g) cannot constitutionally be applied retroactively, as such application would constitute an *ex post facto* law. *See Calder v. Bull,* 3 U.S. 386, 390, 1 L.Ed. 648 (1798) (holding that a category of *ex post facto* laws includes "Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed."), *accord Commonwealth v. Kalck,* 239 Pa. 533, 87 A. 61, 62 (1913) (adopting the *Calder* definitions verbatim). In *Gaddis, supra,* this Court found 42 Pa.C.S.A. § 9728(g) to be a penal statute, and nothing in the 2006 amendments effect a change in this determination. *See Gaddis* at 472; *see also,* 2006 Pa. Legis. Serv. Act 2006–143. Furthermore, the amended version of 42 Pa.C.S.A. § 9728(g) attaches greater punishment to all crimes governed by the provision by allowing a court to expand the definition of "costs" that can be imposed.

¶ 60 The trial court's Order of sheriff's transportation costs must, therefore, be vacated. A remand on this issue, however, is inappropriate because transportation expenses cannot be awarded as costs, pursuant to either 42 Pa.C.S.A. § 9728(g) or 16 P.S. § 1403, and also can not be reclassi-

---

**29.** Although appellant did not raise the issue of retroactive application, we believe it is equitable to consider the issue because the amended version of 42 Pa.C.S.A. § 9728(g), **Costs, etc.,** was passed after appellant filed both his brief and reply brief.

fied and then awarded as restitution. *See* 18 Pa.C.S.A. § 1106, **Restitution for injuries to persons or property** (h) (defining restitution as: "The return of the property of the victim or payments in cash or the equivalent thereof pursuant to an order of the court."); *accord* 42 Pa.C.S.A. § 9721(c), **Sentencing generally.**[30]

## Conclusion

¶ 61 Those portions of the judgment of sentence wherein the Commonwealth was awarded a $100 fine, the Crime Victims Compensation Fund was awarded $1,000 in restitution, the Commonwealth was awarded costs of prosecution, and the Commonwealth was awarded the sheriff's transportation costs, are vacated. The matter is remanded for proceedings in which the trial court is directed to determine appropriate amounts for a fine, restitution and the costs of prosecution incurred by the Commonwealth. In all other respects, the judgment of sentence is affirmed.

¶ 62 Jurisdiction relinquished.

¶ 63 McCAFFERY, J., concurs in the result.

---

**30.** The Commonwealth Court recently held that the terms "costs of prosecution" contained in 16 P.S. § 1403, **Expenses incurred by district attorney,** does not include a sheriff's transportation costs incurred for transporting a defendant from a holding facility to court hearings. *Fordyce v. Clerk of Courts,* 869 A.2d 1049, 1051–1053 (Pa.Cmwlth.2005), *appeal denied* 584 Pa. 710, 885 A.2d 44 (2005), *accord Commonwealth v. Williams,* 909 A.2d 419, 420 (Pa.Cmwlth.2006). In reaching these decisions, the Court emphasized that two statutes provide that each county is responsible for its sheriff's transportation costs and, thus, it would be erroneous to read the phrase "costs of prosecution" in section 1403 to encompass such costs. *See* 42 P.S. 21113, **Attending court;** *see also,* 61 P.S. § 461.11, **Cost of transporting prisoners.** We agree with the Commonwealth Court's rationale in these cases.